273 So.2d 609 (1973)
Aubrey P. GRIFFITH
v.
Samuel N. BODDEN et al.
No. 9179.
Court of Appeal of Louisiana, First Circuit.
February 1, 1973.
Rehearing Denied March 14, 1973.
Writ Denied May 18, 1973.
*610 Iddo Pittman, Jr. (Pittman & Matheny), Hammond, for appellant.
Charles B. W. Palmer (Palmer & Palmer), Amite, for appellees.
Before LANDRY, TUCKER, and PICKETT, JJ.
Rehearing En Banc Denied March 14, 1973.
TUCKER, Judge:
This is a suit for personal injuries and property damage sustained by plaintiff Aubrey P. Griffith in an automobile accident with defendant Samuel N. Bodden which occurred on December 4, 1970, about 3:30 P.M., as both parties were proceeding in an easterly direction on Highway 10 in Tangipahoa Parish. The testimony is highly conflicting as to the exact circumstances of the accident. Immediately after the accident plaintiff, who had been in exceptionally bad health and who had had an extensive medical record for the preceding five years, drove himself to the Lallie Kemp Charity Hospital. Dr. Tomoo Tajina, who examined the plaintiff at that time, gave his diagnosis as follows:
"...... When I examined Mr. Griffith, he was well oriented and I found him in no severe distress and his blood pressure was normal and temperature was normal and when I examined him I found very minor lacerations in left elbow and right forearm. Also he complained about some soreness in his left hand. And I did not see any abnormalities in his bony structure and chest was symetric and there was no evidence of a fracture and chest was clear on auscultation hearing by a stethoscope and he had some tenderness in his left back. And his abdomen was normal on examination. So, I ordered x-rayschest x-ray and x-ray of his left hand, which I read as normal."
The only other medical treatment sought by Mr. Griffith following the accident was by his visit to Dr. I. I. Rosen of Amite. Dr. Rosen's report of April 29, 1971 was introduced into the record as P-12 and in it Dr. Rosen states:
"Pursuant to your request I am submitting report of pertinent injuries incurred in alleged auto accident of 4 Dec. 70 in which the left scapular area and index finger were involved.
On 7 Dec. 70, our only examination revealed moderate contusions of the affected areas with a more severe sprain of the left index finger.
Elastoplast fixation of the finger, linement rubs to the contused scapula were advised, anti-inflammatory and analgesics were prescribed and the patient was advised that time was the healing factor."
*611 Plaintiff's 1966 Chevrolet pickup truck which he was driving at the time of the accident has never been repaired but is still in use. This truck was bought in the name of plaintiff's son and remains in his name, but plaintiff claims that it belongs to him. He paid Twelve Hundred and No/100 ($1,200.00) Dollars for it when he purchased it about one and one-half years or two years prior to the accident. Mr. Louis Lamonica, who was qualified as an expert in used cars, stated that the plaintiff's truck had a value of Nine Hundred and no/100 ($900.00) Dollars prior to the accident and One Hundred Fifty and no/100 ($150.00) Dollars after the accident.
On the basis of the aforementioned injuries to person and property plaintiff filed suit against defendant Bodden on January 27, 1971, alleging the following injuries and damage:

1. Past pain and suffering ........ $2,000.00
2. Present pain and suffering ..... 500.00
3. Future pain and suffering ...... 500.00
4. Loss of pickup truck ........... 1,750.00
 ________
 TOTAL $4,750.00

On February 1, 1971, plaintiff's petition was amended solely to name the State Farm Mutual Automobile Insurance Company as a party defendant. The defendants answered on March 8, 1971, denying defendant Bodden's negligence and alleging that the accident was caused solely by plaintiff's own negligence, as set forth below, and that this negligence constituted contributory negligence, barring plaintiff's recovery:
(a) In operating his vehicle at a fast and unlawful rate of speed.
(b) In not having his automobile under control.
(c) In not maintaining a proper look out.
(d) In failing to observe and respect signals given by Bodden.
(e) In operating his automobile under the influence of intoxicating beverages.
(f) In operating his automobile with physical infirmity.
(g) The said Griffith was further guilty of other acts of negligence and carelessness which with the enumerated acts of negligence were the proximate cause of this accident.
The case was pre-tried on May 27, 1971, with no changes having been made in plaintiff's original demands. The case was then fixed for trial on October 26, 1971, but continued at the request of counsel for plaintiff. Finally on January 21, 1972, almost a year after the filing of the original petition, plaintiff filed a supplemental and amending petition in which he set forth for the first time demands for additional medical expenses and increased damages allegedly incurred since the filing of the first petition, as follows:

"(a) Personality regression and anxiety $10,000.00
 (b) Past, present and future suffering 15,000.00
 (c) Medical Expenses, two trips
 to New Orleans 20.00
 (d) Doctor Bills 70.00
 (e) Possible Future Medical Expenses 555.00
 (f) Future Trips (Estimated) 200.00
 (g) Estimated Drug Bills 45.00
 (h) Doctor Bills 21.00
 (i) Dr. I. I. Rosen 28.00
 (j) Loss of wages by Lettie Griffith
 @ $1,900 per year 9,500.00
 (k) Loss of Pickup Truck 4,000.00
 __________
 Total $35,439.00"

The case proceeded to trial on March 13, 1972, and judgment was rendered, read and signed on March 17, 1972, awarding plaintiff Ten Thousand ($10,000.00) Dollars for personal injuries, which was the limit per person of the State Farm liability insurance policy, and Seven Hundred Fifty ($750.00) Dollars property damage.
Application for new trials were filed by both parties and granted on March 17, 1972, allowing additional testimony by depositions. On June 30, 1972, the the trial court rendered judgment in favor of plaintiffs on the new trial, amending the judgment *612 of March 17, 1972, by the very generous addition of Forty-four Thousand Three Hundred Fifty-two ($44,352.00) Dollars loss of wages, discounted at the rate of five (5%) per cent for twelve (12) years, or Thirty-nine Thousand Three Hundred Nine and 50/100 ($39,309.50) Dollars, with a full judgment against defendants Bodden and State Farm Insurance Company of Forty-nine Thousand Three Hundred Nine and 50/100 ($49,309.50) Dollars individually and in solido, for personal injuries and Seven Hundred Fifty ($750.00) Dollars for property damage.
The defendants appealed suspensively from this judgment alleging the following grounds of error:
"1. There was error in the Trial Court's finding that the plaintiff was free of negligence and contributory negligence proximately causing this accident.
2. The Trial Court was in error in granting Seven Hundred Fifty ($750) Dollars for damages for plaintiff's vehicle.
3. The Trial Court was in error in finding that plaintiff had sustained psychological injuries.
4. The Trial Court was in error in finding that plaintiff had sustained loss of income as a result of this accident.
5. The Trial Court was in error in granting judgment against the insurance company in excess of its policy limits."
Plaintiff answered defendants' appeal asking for Ten Thousand ($10,000.00) Dollars more for plaintiff's mental pain and suffering as a result of the accident.

LIABILITY:
Plaintiff was in extremely poor health at the time of the accident. The record of the Lallie Kemp Hospital which was submitted into the record of this case revealed that the plaintiff, while only in his forties, developed arteriosclerosis and high blood pressure. He underwent a disc operation on his back. He also had four operations for blood vessels in his right leg, which were unsuccessful. He suffered cardiac arrest during one of these operations. He developed gangrene, resulting in two separate amputations of the right leg, with the result that it had been removed at the hip before the time of the accident. The plaintiff previously had experienced a stroke and was partially paralyzed on one side at the time of the accident. The blood vessels in his neck had been operated on. He had suffered brain damage and had a speech defect. Plaintiff had suffered chest pains for an extended period prior to the accident. He had been adjudged totally and permanently disabled and had received benefits on this basis from the Veterans Administration and the Social Security Administration since 1966. Plaintiff suffered from hypertension, for which he took medication, and repeatedly complained of being nervous. He experienced dizzy spells and blurred vision, as well as coughing and gagging long prior to the accident. He was in fact taking six different kinds of medication at the time of the accident. For these and other conditions plaintiff regularly visited the Lallie Kemp Hospital prior to the accident. He had also been a patient at the Charity Hospital in New Orleans and the Veterans Administration Hospital, as well. A psychiatrist who saw the plaintiff after the accident described his condition as progressively worse and worse, affecting his brain, a strictly "down hill" case.
Although it would appear that anyone, such as the person described above, who took the steering wheel of an automobile would be guilty of contributory negligence per se, plaintiff's physical and mental inability to drive an automobile on the specific day of the accident or at the time of the accident is not alleged or proven.
*613 His negligence or contributory negligence must be examined on other grounds.
Defendants charge that plaintiff was proceeding at too high a rate of speed and that he should have seen defendant Bodden's signals for a left turn. The evidence on these two points is conflicting, however.
The investigating officer, Trooper Johnny L. Jones, testified that the accident occurred on Louisiana Highway 10 approximately.1 of a mile east of the intersection with Louisiana Highway 1058 a few inches on either side of the center line. He testified that plaintiff's vehicle left 208 feet of marks beginning at the point of impact, veering first to the north side of the road, then crossing the roadway to the south side of the road, where plaintiff passed through a ditch and finally came to rest after knocking down several fence posts. Trooper Jones testified that, apparently, plaintiff did not apply his brakes until after the moment of impact. He thought that the marks were both skid marks and brake marks. He testified that most of the damage was on the right side of plaintiff's vehicle, and two indentations on the left side caused by the fence posts.
Plaintiff Griffith testified that he was proceeding along the highway about 3:00 P.M., and that, as he was approaching Hayden's Grocery, he looked at his speedometer, saw that he was driving about 55 miles per hour, and slowed down to 40 miles per hour as he approached the intersection. He testified further that, as he approached defendant Bodden's automobile proceeding in the same easterly direction, he turned on his passing lights, tooted his horn, and pulled into the left lane to pass him. Griffith thought that he appeared to be stalled as he passed him. He testified that Bodden had on no blinker lights and gave no signal indicating a turn. He stated, however, that defendant Bodden may have had blinker lights on as he positioned his vehicle alongside his, but that he could not have seen them at that point, even if the turn indicator had been on. As he passed the defendant's automobile, according to Griffith, Bodden suddently turned his automobile left into Griffith's truck with the full impact striking the door of the truck, causing Griffith to veer back and forth on the highway and eventually to careen off of it.
The defendant Bodden testified that as he left J. T. Hayden's Grocery, he turned in an easterly direction onto Louisiana Highway 10 at a very slow rate, waiting for a Mr. Hewlett Gill, into whose driveway he intended to turn about three-quarters of a mile down the highway. He told the Trooper that he did not see any cars on the highway when he first came out of the store, but he admitted that plaintiff was in the passing lane when the accident occurred. He testified that he turned his blinker lights on when leaving Hayden's but that they went off as he turned onto the highway. He testified that he turned them back on at a point when anyone behind him could have seen them and known that he was making a left turn. He also testified that he did not give any other left hand signals. Defendant also testified that his automobile was stopped at the moment of impact, and that he did not turn into Griffith.
Defendant's witness, J. T. Hayden, testified that Bodden had just left his store and was proceeding slowly toward Hewlett Gill's house, when he saw the plaintiff passing his store at about 40 to 45 miles per hour, and that he saw Bodden turn on his blinker lights just before he turned left on the highway intending to go into Mr. Hewlett Gill's driveway.
Although Mr. Gill set the plaintiff's rate of speed at 65 to 75 miles per hour, he would not testify that plaintiff did not blow his horn when attempting to pass Mr. Bodden. He also testified that Bodden turned on his blinking light about halfway between Mr. Hayden's store and his own driveway. He also saw him stick out his hand to indicate a left turn as he turned on his blinkers.
*614 The next witness, Willis Broom, whose credibility left something to be desired, and whom the trial judge evidently did not believe, testified that Mr. Bodden did have his blinkers on, as follows: "He gave it when he first left the corner up there at the store because he was right at the turnoff place, it wasn't far and then I saw him throw his arm out and then this fellow come down the road making about 65, I judge, I wouldn't say for certain and hit him on the wrong side of the road. Mr. Broom witnessed the accident from his yard, which occurred, according to Mr. Broom's testimony, "just a little ways from my gate."
It is obvious that defendant's charge that plaintiff was driving at an excessive rate of speed is not proved by a preponderance of the evidence.
Furthermore there is little to substantiate defendant's charge of plaintiff's drinking. Although several witnesses were asked if they saw plaintiff take a drink at the time of the accident, only Mr. Broom testified to that effect. His testimony lost its effect later when he diagnosed the contents of a whiskey bottle in court as an alcoholic beverage, which later was shown to be ice tea. The mere presence in plaintiff's truck of beer cans and a whiskey flask did not necessarily imply his drinking at the time of the accident. This court is highly influenced on this point by the fact that neither the investigating officer nor the doctor who saw the plaintiff immediately after the accident made any reference to his drinking or intoxication.
This court agrees with the trial court in finding that, if Mr. Bodden did turn on his blinkers and extend his arm to indicate his intention to make a left turn into Mr. Hewlett Gill's driveway, he did it just as the plaintiff was in the process of passing him, at a time too late for him to observe these signals.
For the foregoing reasons the evidence is insufficient for this court to overrule the findings of the trial court and make a determination of negligence on the part of the plaintiff.
There is no evidence as to the damage sustained by Bodden's automobile, which leads us to believe that it did not sustain any. The evidence indicates however, that plaintiff's truck was heavily damaged in the area of the door and the back wheel on the right side, which corroborates the other evidence as to defendant's having turned into plaintiff's truck as he attempted to pass it. There is absolutely no damage to the front of plaintiff's vehicle, as there would have been, in all probability, if he had hit the defendant, as alleged by some witnesses. We find from a careful analysis of the testimony and other evidence that the proximate cause of the accident herein sued upon was that defendant turned left into plaintiff's truck without giving him sufficient notice of his intention to make a left turn, in violation of R.S. 32:104 and 122. Mr. Bodden and his insurance company, therefore, are responsible for the injuries caused the plaintiff, Mr. Griffith.

Property Damage:
There is ample testimony that plaintiff paid Twelve Hundred ($1200.00) Dollars when he purchased the truck damaged in the accident being litigated. The only expert testifying valued this truck at Nine Hundred ($900.00) Dollars before the accident, and One Hundred Fifty ($150.00) Dollars immediately thereafter. Although the truck, unrepaired, is still in limited use, we find no error in the trial court's valuation of the damage sustained by this truck as Seven Hundred Fifty ($750.00) Dollars. We accept the plaintiff's testimony that this truck, although purchased in his son's name, was actually his.
Physical Injuries:
Plaintiff's physical injuries as detailed in the two doctor's reports given *615 above were quite minor. Plaintiff originally asked Three Thousand ($3,000.00) Dollars for these injuries, including the pain and suffering. We think that an award of One Thousand and no/100 ($1,000.00) Dollars would adequately compensate plaintiff for these slight physical injuries sustained by plaintiff.

Psychological Injuries:
Plaintiff's original petition contains no mention of psychological injuries. It was not until almost a year after his original petition was filed, more than a year after the accident, that he first claimed psychological injury attributable to his accident. "[D]ue to the nebulous character of `traumatic neurosis', courts must proceed with utmost caution and scrutinize carefully evidence in support of such a claim............" Boutte v. Mudd Separators, 236 So.2d 906 (La.App.3d Cir. 1970).
The plaintiff in this case was in admittedly deplorable health at the time of the accident, to the extent that one wonders that he would drive a truck anywhere; yet it is questionable that his present degenerative condition can be found to have been caused or accelerated by his accident. The only medical evidence admitted to establish plaintiff's claims of "personality regression and anxiety" is that of Dr. Wallace W. Fleetwood, a psychiatrist in New Orleans, whom plaintiff visited twice on July 22, 1971, and August 28, 1971. Although Dr. Fleetwood stated that the accident caused further personality regression, he based his diagnosis solely on information supplied him by plaintiff and his wife. He did not consult any of his other extensive medical records or his treating physician. He was engaged by plaintiff's counsel as an evaluating physician and did not prescribe or recommend any treatment. Dr. Fleetwood stated quite frankly that it was difficult to determine how much regression was due to traumatic neurosis and how much to the natural progress of his previous condition. He stated, "Well, by the concept of brain damage to the arteries of the head, that in itself is going to induce regression, with or without psychological trauma. Over the long haul he's bound to go downhill."
Apparently Dr. Fleetwood based a large portion of his conclusion on the fact that plaintiff told him that he was taking six doses of valium a day; yet when plaintiff was cross-examined while giving a deposition on March 29, 1971, he stated the following:
"Q. Now, before the accident how often did you take tranquilizers before the accident?
A. Well, one week I might take two and it might be two or three weeks before I have to have another one. If something get me all excited, I take a tranquilizer and lay down.
Q. Well, now, did they just tell you to use these tranquillizers at your own discretion, when you felt you needed one or
A. Yes sir, not to take more than four a day.
Q. More than four a day?
A. No more than four a day but I ain't neverthe only time I ever took two a day is today.

Q. Todayso, you have only taken one a day since the accident and sometimes do you skip a day or do you take one a day?
A. Well, I generally take one every morning, seems like I feel better in the morning. Worser in the morningseems like in the evening I feel better." (page 22 of deposition-italics ours.)
It is obvious from plaintiff's own deposition that since the accident he has only taken one tranquilizer a day except the day of the deposition when he took two.
*616 Dr. Fleetwood stated that the correct dosage for an adult of valium, ten milligrams, would be three and not more than four a day. The doctor further stated that valium is not considered to be a heavy tranquilizer, and that he considered one 10 milligram tablet of valium a day the minimal dosage and that three was the average dosage.
In the light of plaintiff's deposition and Dr. Fleetwood's statements as to dosage it seems very unlikely that he had progressed to six doses of valium by the time that he was examined by Dr. Fleetwood in New Orleans. It seems more reasonable to conclude that he was somewhat confused when being examined by Dr. Fleetwood.
Dr. Fleetwood's statement based on information supplied him by the plaintiff to the effect that plaintiff was withdrawn after the accident, seems to be belied by the testimony of a number of other witnesses who had seen plaintiff out and about in society after the accident.
The testimony of the treating physician is entitled to more weight than that of the evaluating physician who saw the patient only after the accident and only for the purposes of evaluation.
The extensive hospitalization records of the many and varied treatments accorded the plaintiff at the Lallie Kemp Charity Hospital and Charity Hospital in New Orleans do violence to the appraisal of Dr. Fleetwood. We believe that the facts of the instant case are analogous to the situation where the opinion of the treating physician is entitled to more weight than that of a physician who has merely examined the patient on very few occasions. See Johnson v. R. P. Farnsworth Co., Inc., 186 So.2d 405 (La.App.1st Cir. 1966).
Plaintiff's medical record introduced into evidence is replete with much evidence of his arteriosclerosis, brain damage, hypertension (high blood pressure), and anxiety prior to his accident, with the prognosis of a progressively deteriorating condition. We find Dr. Fleetwood's testimony insufficient to prove that plaintiff suffered a traumatic psychological condition as a result of his accident, or that the accident in any way accelerated or aggravated his already existing ailments. The testimony of plaintiff's wife to the effect that he was hard to live with, and the testimony of his friends to the effect that he had ceased to engage in a number of activities in which he previously engaged likewise serve to prove the progressive nature of plaintiff's manifold ills, rather than that he suffered a traumatic psychological neurosis as a result of his accident. This court finds it significant that in the time elapsing between the accident and the trial plaintiff never sought any special treatment for any mental condition although there were a number of institutions available to him free of charge. Certainly the record is indicative of a man who is quite conversant with doctors and hospitals and knows how and where to seek treatment when it is needed. We do not find that the welter of evidence in this record preponderates to prove that plaintiff suffered traumatic psychological damage in his accident. The finding of the trial court is overruled on this point.

Loss of Earnings:
Even more amazing than the trial court's award to plaintiff for his alleged traumatic psychological injury is the court's award to plaintiff of $39,309.50 for loss of earnings when plaintiff did not even pray for it nor submit any evidence upon which such an award could be based.
Plaintiff had been adjudged totally and permanently disabled by the Veterans Administration and by the Social Security Administration in 1965. He had filed no income tax returns since 1967. By his own admission plaintiff had had no casual earnings *617 since 1968. This was also confirmed by at least one witness. There is no evidence whatsoever to indicate that plaintiff sustained any loss of earnings as a result of his accident. The finding of the trial court on this score is erroneous and is set aside.
Although plaintiff did pray for damages for loss of his wife's wages in his supplemental and amended petition, on the allegations that it was necessary for her to stay home to take care of him, the trial court did not act on this prayer. The trial court was correct in not awarding plaintiff damages for loss of his wife's wages. Plaintiff did not produce any income tax returns or any earnings records to establish his wife's income at any time, nor did he allege any particular loss of income due to his accident. Plaintiff's wife testified that she was not working at the time of the accident, had not worked at all in 1970, and only a part of 1969. She indicated that she quit her job in a canning factory in 1969 due to arthritis in her arm.

Judgment in Excess of the Policy:
Our ruling on the various points addressed above makes it unnecessary to decide this particular issue.
For the foregoing reasons the judgment of the trial court in its award to the plaintiff of damages for his bodily injuries, pain and suffering and loss of wages is reduced to the sum of One Thousand and no/100 ($1,000.00) Dollars, and, accordingly, there will be judgment in favor of the plaintiff, Aubrey P. Griffith, and against the defendants, Samuel N. Bodden and State Farm Mutual Automobile Insurance Company, jointly, severally, and in solido, in the full sum of One Thousand Seven Hundred Fifty and no/100 ($1,750.00) Dollars with legal interest from judicial demand until paid. Appellee is cast with the costs of this appeal.
Judgment affirmed, as amended and recast.