SCHOTT, Judge.
On July 19, 1969, plaintiff, Mrs. Locas-cio, brought clothes for washing to the Lake Terrace Sunshine Center, a coin operated laundry and cleaning establishment owned by defendants, Robert H. Dudley and William H. Dudley, III, and insured against public liability by defendant, Maryland Casualty Company. She had parked her automobile in a parking area at the rear of the establishment and entered through a rear door. When she completed her washing she left carrying an armful of clothes through the rear door and into the parking lot, where she stepped onto a sharp object later identified as a roofing nail. More particularly, the nail is approximately three-quarters of an inch in length, the diameter of its spike measures approximately one-eighth of an inch and its flat head is approximately one-half of an inch in diameter.
Defendants Robert H. and William H. Dudley, III, were the lessees of the laundry’s premises by virtue of a lease from defendant, Henry F. Bonura, but the premises were owned by defendant, Lake Terrace Center, Inc., of which defendant Bon-ura was president. Pursuant to the lease Bonura was to maintain the parking area of the shopping center, including the area where plaintiff met with her accident. Defendant, Employers Mutual of Wausau, was the liability insurer of both defendants, Lake Terrace Center, Inc. and Henry F. Bonura. ■
The judgment from which defendants, Lake Terrace, Bonura, and Employers Mutual, have appealed was in favor of plain *512 tiffs and against them in the amount of $13,646.09 and was also in favor of defendants, the Dudleys and Maryland, dismissing the suit as against them.
The trial judge found that it was customary for laundry patrons to make use of the rear door of the premises; that there had been some roofing repairs done around the shopping center and around the date of plaintiff’s injury; that the presence of the roofing nail on the ground of the parking lot was a dangerous condition; that its presence was accounted for by the roofing repairs; that the defendants were under a legal obligation to exercise ordinary care for the safety of the premises and committed a breach of such duty; and that the defendants failed to prove that they had discharged their duty of exercising ordinary care in the cleaning of the area.
There is a conflict in the evidence as to exactly when the roofing work was done at or near the premises occupied by the laundry. Plaintiff testified that there was roofing work going on the day of the accident because she saw a truck containing roofing materials in the vicinity, although she maintained that there was no identifying name on the truck. One employee of the laundry was sure that some roofing repairs were being made “along about that time” but could not specify the date of such work. The employee of the laundry to whom Mrs. Locascio reported her accident recalled that roofing was being done on one of the buildings in the shopping center at the time but could not recall which one. Defendant Bonura testified that there was no roofing done on the date of plaintiff’s accident although some had been done previous to her accident. Based on the bills he had gone over from his own records, he said that no roofing work had occurred within ten days prior to plaintiff’s accident.
From our reading of the record, we find no error in the trial judge’s concluding from the testimony that this roofing nail’s presence in the parking lot was the result of roofing work done by the owner and lessor through their agents at some time prior to the date of plaintiff’s accident.
Defendants’ first contention is that plaintiff did not maintain her burden of proof as to their negligence, citing Meek v. Travelers Ins. Co., 188 So.2d 677 (La.App. 4th Cir.), they maintain that the nail was not a hidden danger or trap but was readily apparent. But from our own inspection of the nail which is in evidence before us we find that it was indeed dangerous as it lay on the ground on its flat head with its short, narrow spike sticking straight up. It was far more dangerous than a crack such as the one involved in the Meek case because, while one might reasonably anticipate the presence of cracks in pavement, no one expects to encounter a hazard such as this nail which caused plaintiff’s injury. Furthermore, this nail was inherently dangerous while a crack in pavement might be only relatively dangerous, depending on the size of one’s shoes, whether it is hidden by water or grass, or other factors.
The trial judge approached this case from the standpoint of the existence of a dangerous condition, negligence on the part of defendants in allowing that condition, constructive knowledge of the danger on the part of the defendants and their failure to prove adequate cleanup procedures in order to discharge their duty to plaintiff. Taking up this approach, defendants contend that their duty is the same as that of the operator of a self-service store with respect to foreign substances causing injury to customers, and that according to the jurisprudence of this Court, the burden is on plaintiff to prove that the nail was on the ground of the parking lot for a sufficient period of time to establish constructive knowledge on the part of defendants of its presence and in the absence of such proof the burden is not placed on defendants to prove the adequacy of cleanup procedures. Defendants argue that since plaintiff followed the same path on her way into the laundry and spent some 45 minutes there *513 in it necessarily follows that the nail was there for less than 45 minutes.
This of course is a non sequitur since the plaintiff may very well have missed the nail on her way in or since it is quite possible that the position of the nail . was moved from one spot to the other in the parking lot by passing vehicles and pedestrians in the meantime. But regardless of these considerations we are convinced from the evidence that the doctrine of constructive knowledge has nothing to do with the result of this case.
At the outset of this discussion it must be said that under the circumstances of this case, the defendants who are the owners and landlords of the premises have the same legal duty to business invitees, such as plaintiff, as does the immediate business invitor, the owners and operators of the laundry and tenants of the premises. The laundry operators under the terms of their lease paid the landlord fifteen dollars per month “toward the cost of cleaning, lighting and generally maintaining said parking area,” but the landlord retained responsibility for the parking lot over which plaintiff had to pass in order to enter the leased premises. In the case of Soldano v. New York Life Ins. Co., 196 So. 521 (La.App.Orl.1940), this Court held that a person entering an office building to do business with tenants occupying space therein is an invitee of the building owner, and the same would apply to the parties in this case.
The troublesome question of constructive knowledge does not arise in slip and fall cases in self-service stores where the offending substance was placed or left in its hazardous position by the storekeeper or his agents or employees, but arises only in cases where it was placed in such a position by a third person.
The case of Pilie v. National Food Stores of Louisiana, Inc., 245 La. 276, 158 So.2d 162, has been the source for much conflicting and troublesome jurisprudence in slip and fall cases where there is the possibility that another customer caused a hazard to be present, but it causes no difficulty where the owner or his agents or employees causes such a hazard:
“As pointed out previously, our own jurisprudence is in accord with the view that each case must be decided on its own facts and circumstances, and that res ipsa loquitur will not be applied unless the facts and circumstances indicate that the negligence of the defendant, rather than the negligence of others, is the most plausible explanation of the accident. Accordingly in answer to plaintiffs’ question of law, the facts and circumstances of this case do not permit the application of the doctrine of res ipsa lo-quitur because from them we cannot draw the inference that it was National’s negligence, rather than the negligence of others, that caused the cartons to fall.”
Following this rationale, the Court in Carpenter v. National Food Stores of Louisiana, Inc., 278 So.2d 570 (La.App. 1st Cir. 1973) said the following:
“Concerning liability, the parties are in agreement that a plaintiff in a slip and fall case bears the burden of proving either that the substance rendering the premises hazardous was placed or left in the position in which it caused the accident by the storekeeper or his agents or employees, or if placed by a third person, that it remained on the floor for such a period as to charge the storekeeper with constructive knowledge of its presence. Harper v. Great Atlantic & Pacific Tea Company, La.App., 257 So.2d 468; Cunningham v. Southern Bell Telephone & Telegraph Company, La.App., 215 So.2d 661.”
The Court, in the last cited case, found that the defendant was liable because under the facts the foreign substance was found to have been placed on the floor by the store’s employees and not by the customers, so that the problem of constructive knowledge played no part.
*514 In the instant case, the roofing work was done by defendants’ agents. While the suggestion is made that defendants always used the services of independent contractors to perform roofing work, such contractors were defendants’ agents as far as defendants’ invitee, the plaintiff, was concerned. Since the evidence supports the trial judge’s conclusion that plaintiff did suffer injury as a result of a roofing nail left' on the ground of the parking lot by defendants’ agents, defendants are liable to plaintiff under LSA-C.C. Arts. 2315 and 2317. The cases of Hickman v. Southern Pacific Transport Co., 262 La. 102, 262 So.2d 385, and Richardson v. Tate, 269 So.2d 278 (La.App. 4th Cir.1972), cited by defendants are inapposite. They are concerned with the issue of vicarious liability vel non of employers for torts committed by those who may or may not be employees. The liability of defendants in the instant case is not vicarious but direct with respect to their invitee.
Since the nail’s presence was accounted for by defendants’ roofing work it makes no difference whether the work was done that day or several days previously. Negligence on defendants’ part was thereby established. Of course, had defendants come forward with convincing testimony that this particular area was thoroughly cleaned between the time the work was done and the time of the accident the conclusion would follow that the nail’s presence was caused by some one other than defendants’ roofing agents, and the problem of constructive knowledge would be present. But the only testimony bearing on the subject of cleaning up was Bonura’s to the effect that he had an employee who is supposed to do this. This is hardly sufficient for defendants to establish that this parking lot was thoroughly cleaned up at any time since the roofing work was done.
Defendants have also contended that plaintiff was guilty of contributory negligence in that she should have seen the nail on the ground. We find no error in the trial judge’s rejection of this defense. The nail in question is most inconspicuous and could have been effectively avoided only if plaintiff had fixed her eyes continuously on the pavement ahead of her as she proceeded. To impose such a standard of care on a pedestrian would be unrealistic.
Finally, defendants maintain that the award of general damages in the amount of $12,000 is excessive, and they contend that since the medical evidence was in the form of medical reports and since no doctors testified at the trial, this Court is in as good position to evaluate the evidence as was the trial court. In support of that proposition they cite Freeman v. Standard Materials, Inc., La.App., 246 So.2d 258.
 The cited case was a Workmen’s Compensation case in which the alleged disability of the plaintiff was at issue and the Court was required to evaluate the testimony of several doctors given at depositions. In such a case the Court properly held that it was not bound by the actual findings of the trial judge based upon the testimony of the physicians since the trial judge did not have the benefit of their live testimony at the trial. But we are concerned here with the assessment of general damages under the provisions of LSA-C.C. Art. 1934, which vests much discretion in the trial judge in the assessment of such damages. Whether he makes that assessment on the basis of medical reports or live testimony the discretion is with him and not with an appellate court, so that the only question before us is whether his award was so excessive that it constituted an abuse of his discretion.
Plaintiff first saw Dr. Charles Wheeler on the day of the accident, July 19, 1969, and was treated by him for about three weeks. Initially she received Tetanus antitoxin, antibiotics, and was restrained from weight bearing but she continued to have pain and swelling of the forefoot and consulted Dr. Raymond ICit-ziger, an orthopedic surgeon.' On the basis of his examination, including X-ray films, *515 he found destructive changes of the proximal phalanx of the third toe compatible with osteomyolitis, and he placed her on antibiotics soaks and non-weight bearing. Because the infection was not being controlled by these means she was admitted to the hospital on September 3, 1969, where, under general anesthesia, the base of the proximal phalanx of the third toe was re-sected and the wound drained to the exterior. She continued on medication after being discharged from the hospital on September 8. By the end of September she was begun on partial weight bearing. But on November 20 she was still found with swelling under the third metatarsal head so that a resection was performed with attendant hospitalization between December 1 and December 3. Although she improved after this surgery she felt pain and swelling under the left third metatarso-phalangeal joint and a plastic arch support was prescribed. On March 24, 1970, further surgery was done by means of an incision behind the web of the toes and a large amount of scar tissue containing some rust particles was removed. On April 2 the sutures were removed and she was allowed partial weight bearing. It was felt that she would require shoe correction for an indefinite length of time, and she was advised to avoid high-healed shoes and to continue with the arch support. She was last seen on January 19, 1973, a short time before the trial of the case and was complaining of swelling with pain. Dr. Kitziger found that the third toe had retracted due to the absence of the metatarsal head and that there was mild tenderness on the surface of the foot. In his opinion, plaintiff has a 15% permanent partial disability of the left foot. Plaintiff testified that she continues to wear the support to prevent pressure on her foot, her third toe has shrunk, she cannot walk in bare feet, still suffers swelling, takes medication and uses the plastic arch support in her shoe. She had used crutches from the time of the accident until March of 1970, a period in excess of eight months. Under these circumstances, we cannot say that the trial judge abused his discretion in awarding $12,000 for general damages, together with the $1,646.09 for medical expenses. See Fox v. State Farm Mutual Automobile Insurance Company, 288 So.2d 42 (La.Sup.Ct. Dec. 3, 1973).
Accordingly, the judgment appealed from is affirmed and defendants are to pay the costs of this appeal.
Affirmed.